IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:22-cr-178-MSN-7 |
| ADONIS ADALBERTO MARTINEZ AYALA, a/k/a "Monito," a/k/a "Malvado," | Sentencing: September 19, 2024 |
| *Defendant.* | |

**UNITED STATES' POSITION WITH RESPECT TO SENTENCING**

The United States of America, through undersigned counsel and in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("guidelines" or "U.S.S.G."), hereby submits its position with respect to the sentencing of the defendant, Adonis Adalberto Martinez Ayala. The defendant pled guilty to a racketeering conspiracy offense arising from his participation in murders committed in furtherance of the interests of *La Mara Salvatrucha*, also known as MS-13, the violent transnational gang of which he was a member. The government has reviewed the Presentence Investigation Report ("PSR") and concurs with the findings of the Probation Office, which has correctly calculated that the defendant falls in criminal history category II. Pursuant to the Plea Agreement, the defendant pled guilty to a Criminal Information (Docket Entry ("DE") 266), which charged Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 U.S.C. § 1962(d), and alleged two murders in violation of Virginia law as special sentencing factors. With a total offense level of 43 and a criminal history category of II, the defendant faces life in prison under the guidelines. In keeping with the Plea Agreement negotiated by the parties in this case and for the reasons stated

1

below, the government respectfully requests that the Court sentence the defendant to 540 months' imprisonment, to be followed by five years of supervised release.

## I.    OVERVIEW OF APPLICABLE LAW

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Next, "the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id.* Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a).

Although the guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the Court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citations omitted). Indeed, in the ordinary case, there will be a significant amount of overlap between the guidelines range and the remaining § 3553(a) factors, because the guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

For example, the guidelines encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an offense level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the offense), as well as reflect "the history and characteristics of the defendant" (most notably by

establishing a criminal history category based on the defendant's prior criminal record). 18 U.S.C. § 3553(a)(1). The guidelines further help to prevent "unwarranted sentencing disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they were sentenced. *Id.* § 3553(a)(6); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Thus, although the guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall*, 552 U.S. at 49. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

## II.   BACKGROUND

### A.   Factual Background

In 1961, real estate entrepreneur Robert E. Simon used the proceeds of his family's sale of Carnegie Hall in Midtown Manhattan to buy nearly 7,000 acres of land in Fairfax County, Virginia. Robert D. McFadden, *Robert E. Simon Jr., Who Created a Town, Reston, Va., Dies at 101*, N.Y. Times, Sept. 21, 2015.[1] A few years later, he launched Reston – Northern Virginia's first planned community. *Id.* Today, Reston is home to many affluent residents, countless technology firms, and a high-end town center. But Reston – particularly the Hunters Woods area – is also home to a large number of working class immigrants, many of whom hail from the San Vicente Department of El

---

[1] https://www.nytimes.com/2015/09/22/realestate/communities/robert-e-simon-jr-founder-of reston-va-dies-at-101.html

Salvador. A large number of these men, women, and children who have come to the United States in search of a better life live in apartments and duplexes that abut both sides of Reston Parkway between Fox Mill Road and South Lakes Drive. Unfortunately for the hardworking members of this community, MS-13's *Uniones Locos Salvatrucha* clique (hereinafter, "ULS") has long considered their neighborhood to be its "*cancha*," or turf.

The defendant and his co-conspirators brutally murdered four residents of this community in three years. In June 2019, the defendant and other ULS members and associates decided that they had finally had enough of a group of men who congregated in the woods behind Hunters Woods Village Plaza. Some of these men pedaled drugs, some of them shoplifted alcohol from local businesses, and most if not all of them drank heavily in public. PSR at ¶ 32. Their activities attracted police attention, which threatened ULS' drug dealing operation and its grip on its perceived turf. *Id.* On June 22, 2019, ULS members and associates gathered in a hotel room at the Extended Stay America hotel in Fairfax and hatched a plan that involved traveling to what they believed was their turf and killing one or more of these men. *Id.* In the early morning hours of June 23, 2019, the defendant and his fellow MS-13 members went to the woods to carry out their attack. *Id.* They murdered J.L.G.M., the first man they encountered. While the repeated shots ULS members fired into him with two different firearms certainly would have been sufficiently lethal, the defendant hacked J.L.G.M. with MS-13's signature weapon of choice, a machete, so that he could rise in rank within the gang. *Id.* at ¶¶ 34 and 35. They left J.L.G.M.'s body next to a footpath in the woods for others to find and collect like the beer cans that littered the area where he died.

More than a year later, in September 2020, ULS decided to leave someone else's body to be discovered on its perceived turf – this time down the street from an elementary school. I.J.P.G.

4

had maligned MS-13 on social media and represented herself as an associate of MS-13's archenemy, the 18th Street Gang. *Id.* at 36. In MS-13's eyes, these were capital crimes. Shortly after midnight, she got into a car with young men she did not know were MS-13 gang members. *Id.* at 37. She got out of that car near the intersection of Colts Neck Road and Insha Court, where the defendant and another MS-13 member were lying in wait. *Id.* at 37. The unarmed, 19-year old waitress was hardly a match for the defendant and the three other men who shot her repeatedly in the head and upper torso. While the gunshots rang out loud, there was no moon that night, and cars were parked along the curb over which she died sprawling. Her body was not found on the side of Colts Neck Road until hours later close to sunrise. A young woman died, and once again the defendant was promoted within his gang.

On May 30, 2022, the defendant met up with three other MS-13 members so that they could patrol what they believed was their turf in Reston. *Id.* at 41. They had not been there long before they encountered R.A.P.S., another fixture of Hunters Woods whose public drinking and associations with the men who attracted police to the area had already marked him for death with an MS-13 "green light," which doubles as an authorization and order to murder. *Id.* at 42. The defendant and his co-conspirators were armed with firearms, *see id.* at 41, but there was no need to use them and attract unnecessary attention. It was four versus one, and they murdered R.A.P.S. quietly by repeatedly kicking him and dropping large stones onto his face. *Id.* at 43. This time it was someone else's turn to get promoted, and another MS-13 member was rewarded with a new rank in the gang for murdering R.A.P.S. A memorial to J.L.G.M., a white cross placed near where his body was found nearly three years earlier, appears in the photos Fairfax County detectives took

of the scene where R.A.P.S.'s body was discovered.

The final murder that the defendant committed was not like the others. The victim was not slain in Reston. He was not left for others to find. And the defendant knew him. On or about June 18, 2022, F.R.A.R., himself a ULS associate, walked deep into Seneca Regional Park in Great Falls to meet up with men he likely viewed as his brothers. F.R.A.R. believed that he was attending a ULS meeting during which he would be receiving a disciplinary beating for violating MS-13's rules. *Id.* at 46. These beatings, which typically consisted of thirteen baseball bat strikes to the buttocks and upper thighs for minor transgressions like not answering one's phone when the gang called, were hardly uncommon, and the defendant and other ULS members often meted out and received such punishments. But this beating was different. The thirteenth bat strike was to the back of F.R.A.R.'s skull, and F.R.A.R. was stabbed repeatedly after he hit the ground. The defendant and his fellow gang members decapitated and dismembered F.R.A.R. and buried him in a clandestine grave, where he stayed for more than a year until his remains were exhumed by the Federal Bureau of Investigation's Evidence Recovery Team in July 2023. *Id.* at 49.

### B.   Procedural History

On October 5, 2023, the grand jury returned a Second Superseding Indictment charging the defendant in Count One with Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 U.S.C. § 1962(d),[2] and in Count Eight with Conspiracy to Commit Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. §§ 1959(a)(5). DE 113. On October 6, 2024, the defendant was arrested. On October 26, 2023, a jury trial was scheduled for October 7, 2024.

---

[2] This charge, which did not allege that the defendant committed murder as a special sentencing factor, was punishable by a statutory maximum of 20 years pursuant to 18 U.S.C. § 1963(a).

DE 139.

On June 5, 2024, pursuant to a Plea Agreement, the defendant pled guilty to a Criminal Information charging him with Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 U.S.C. § 1962(d), with the murders of J.L.G.M. and F.R.A.R. alleged as special sentencing factors. DE 239. As part of that agreement, the parties agreed, pursuant to Fed. R. Crim. P. 11(c)(1)(C), that the defendant would receive a sentence not less than 480 months' imprisonment and not greater than 540 months' imprisonment. *See* DE 269 at ¶ 5. The Court accepted the defendant's plea of guilty and scheduled this matter for sentencing on September 19, 2024. DE 268.

III.   **DISCUSSION**

A.   **Sentencing Guidelines**

The government has no objection to the applicable guidelines calculated in the PSR. The guideline for Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 U.S.C. § 1962(d), is U.S.S.G. § 2E1.1. Pursuant to Application Note 1 of U.S.S.G. § 2E1.1, each racketeering offense in Count One is treated as a "pseudo count." PSR at ¶ 59. Each "pseudo count" that is based on murder has both a base offense level and also an adjusted offense level of 43, pursuant to U.S.S.G. § 2E1.3(a)(2) by cross-reference to U.S.S.G. § 2A1.1(a). *Id.* at ¶¶ 60, 65, 66, 71, 72, 77, 78, and 83. The "pseudo count" based on drug trafficking has a base offense level of 12, pursuant to U.S.S.G. § 2E1.1(a)(2) by cross-reference to U.S.S.G. § 2D1.1(a)(5)(C)(14); a two-level enhancement for a dangerous weapon applies under U.S.S.G. § 2D1.1(b)(1), and thus the adjusted offense level is 14. *Id.* at ¶¶ 84-89. Adjusting for multiple counts pursuant to U.S.S.G. § 3D1.4, there are four units. *Id.* at ¶ 90. Taking the greater of the adjusted offense levels from the

"pseudo counts" (i.e., 43) and adding the additional four-level increase due to the total number of units, the combined adjusted offense level is 47. *See* U.S.S.G. § 3D1.4; *see also* PSR at ¶¶ 90-93.

The defendant has demonstrated acceptance of responsibility, and he should receive a two-level reduction under U.S.S.G. § 3E1.1(a). PSR at ¶¶ 95. Because the defendant qualifies for a two-level decrease in offense level pursuant to U.S.S.G. § 3E1.1(a), and the offense level prior to the operation of that section is a level 16 or greater, the government – as agreed to in the Plea Agreement – moves for an additional one-level decrease, pursuant to U.S.S.G. § 3E1.1(b). *See* PSR at ¶ 96. Thus, the defendant has a total offense level of 43. PSR at ¶ 97.

Based on the defendant's criminal history, the defendant falls into criminal history category II.[3] *Id.* at ¶ 105. The advisory guidelines for a defendant with an offense level of 43 and a criminal history category of II is life in prison, to be followed by two to five years of supervised release. *Id.* at ¶¶ 132.

### B.     Section 3553(a) Factors

The Section 3553(a) factors in this case counsel in favor of imposing a term of 45 years' imprisonment, to be followed by five years of supervised release.

In this case, a 45-year custodial sentence appropriate and warranted based on several factors. The ULS clique murdered multiple victims over several years, often targeting individuals that MS-13 perceived to be problematic for some reason, such as those believed to be associated with rival gangs and sometimes even those associated with MS-13. This defendant was a part of MS-13 for years and murdered four people during his tenure with the gang. The defendant was an

---

[3] Regardless of whether the Court agrees with the defendant that his criminal history is overstated as a result of his 2019 conviction for possession of marijuana, his advisory guidelines sentence will be life imprisonment.

active participant in each of the murders he committed, and the nature, circumstances, and seriousness of the defendant's conduct are abundantly clear. Notwithstanding the foregoing, a 45-year sentence appropriately takes into consideration the timing and practical realities of this prosecution.

In addition, a 45-year sentence is necessary to promote respect for the law, to provide just punishment, to adequately deter future criminal conduct by the defendant and others, and to communicate to the public the seriousness of these offenses. The seriousness of the defendant's conduct cannot be understated, and the need to promote respect for the law is apparent here. *La Mara Salvatrucha* is a thief. MS-13 robs its victims of their lives. It robs those victims' loved ones of their children, parents, spouses, and friends. It robs the young men who make up its ranks of their futures, skyrocketing the likelihood they will be killed or spend decades in prison after they are eventually called upon to move up the gang's ladder. It robs those dead and incarcerated members' children of their fathers. It robs the communities in which it operates of their sense of security. It robs those who left everything and everyone behind fleeing gang violence of their optimism that things will be different here.

MS-13 maintains a significant presence throughout the Eastern District of Virginia, and many murders and other crimes have been attributed to the gang in recent years. A 45-year sentence would signal not only to the defendant but also to others considering participating in a violent racketeering conspiracy that such conduct will not be tolerated and carries significant penalties. Moreover, while decades in federal prison will not bring back the victims, it would bring some measure of justice to the victims' families.

The government credits the defendant for taking responsibility in this case. As discussed in the PSR, the defendant's youth was marred by significant difficulties in El Salvador and in the United States. That said, nothing that the defendant experienced justifies the decision to be and remain an MS-13 gang member that he made each and every day for years.

The government believes that a five-year period of supervised release is appropriate in this case. Ordinarily, a court should not impose a term of supervised release in a case, like this one, in which supervised release is not required by statute and the defendant is a deportable alien. U.S.S.G. § 5D1.1, comment. (n.5). A court should, however, consider imposing a term of supervised release on such a defendant if it determines that doing so "would provide an added measure of deterrence and protection based on the facts and circumstances of the particular case." *Id.* Given that the defendant, during his time in the United States, played a role in multiple murders, such an added measure of deterrence and protection is needed and can be achieved by imposing a term of supervised release.

For conditions of supervision, the government requests the mandatory, standard, and special conditions listed in the PSR. PSR at 22-25. Regarding monetary penalties, as part of the Plea Agreement, the defendant must pay the mandatory special assessment of $100. In addition, the defendant has agreed to pay restitution to the families of the two victims whose murders were alleged to constitute special sentencing factors in Count One of the Information to which he pled. *See id.* at ¶ 11. The government has not yet received the necessary information regarding restitution

sought by the government for the victims' families.[4] The government may ask the Court to set a date in the future for the final determination of the victims' losses; the defendant has specifically waived in his Plea Agreement the 90-day provision found at 18 U.S.C. § 3664(d)(5) and consents to the entry of any orders pertaining to restitution after sentencing without limitation. The government will ask that any defendants convicted for offenses related to the murders of J.L.G.M. and F.R.A.R. be made jointly and severally liable for any restitution to those victims' families.

## IV.    RECOMMENDATION

Based on the foregoing, the government asks the Court to sentence the defendant to 540 months' imprisonment, to be followed by five years of supervised release. Such a sentence would account for the nature of the crimes, promote respect for the law, and provide the requisite level of specific and general deterrence. The United States will provide the Court with any victim impact statements that the victims' relatives choose to submit and has informed the victims' loved ones of their right to be heard at the defendant's sentencing hearing.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:    /s/
John C. Blanchard
Megan C. Braun
Assistant United States Attorneys

---

[4] The government is coordinating with the victims' family members to compile this information to the extent practicable, through F.R.A.R.'s bones and teeth must unfortunately be held as evidence until the conclusion of this case and burial costs are therefore nebulous. Several victims' family members have also expressed concerns about wages they will lose should they choose to attend the trial.

## CERTIFICATE OF SERVICE

I certify that on September 12, 2024, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause a true and accurate copy of this document to be transmitted to counsel of record.

By:    _____/s/_____
John C. Blanchard
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3999
Fax: (703) 299-3980
John.Blanchard@usdoj.gov

12